# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39407 (rem)**

———————————

**UNITED STATES**
*Appellee*

v.

**Humphrey DANIELS III**
Lieutenant Colonel (O-5), U.S. Air Force, *Appellant*

———————————

On Remand from
the United States Court of Appeals for the Armed Forces

Decided 9 August 2022

———————————

*Military Judge:* L. Martin Powell (arraignment); J. Wesley Moore (motions); Natalie D. Richardson (motions and trial).

*Approved sentence:* Dismissal, confinement for 2 years and 252 days, and a reprimand. Sentence adjudged 14 June 2017 by GCM convened at Joint Base Andrews Naval Air Facility Washington, Maryland.

*For Appellant:* Major Jenna M. Arroyo, USAF; Tami L. Mitchell, Esquire.

*For Appellee:* Lieutenant Colonel Amanda L.K. Linares, USAF; Major Cortland T. Bobczynski, USAF; Major Zachary West, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, POSCH, and ANNEXSTAD, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

Appellant's case is before us for the second time. A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of negligent dereliction of duty, one specification of rape, and four specifications of conduct unbecoming an officer and a gentleman in violation of Articles 92, 120, and 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 933, corresponding to Charges I, II, and III, respectively.[1,2] The court members adjudged a sentence of a dismissal, confinement for three years, and a reprimand. The convening authority reduced the term of confinement to 2 years and 252 days, but otherwise approved the adjudged sentence. The convening authority also deferred the mandatory forfeiture of pay and allowances from the effective date of the forfeiture until the date the convening authority took action on the sentence.

On appeal, Appellant initially raised 14 issues: (1) whether the statute of limitations had run on the alleged offense of rape (Charge II); (2) whether Appellant's convictions for negligent dereliction of duty (Charge I) and conduct unbecoming an officer and a gentleman (Charge III) are factually and legally insufficient; (3) whether Charge III and its specifications fail to state an offense; (4) whether the military judge erred in admitting a transcript of Appellant's testimony from his criminal trial in civilian court; (5) whether the trial counsel engaged in prosecutorial misconduct during closing and rebuttal argument; (6) whether the court members failed to comply with the military judge's instructions; (7) whether Appellant was entitled to relief for unreasonable post-trial delay; (8) whether Appellant's conviction for rape is legally and factually insufficient; (9) whether Appellant's trial defense counsel were ineffective for failing to move to dismiss Charge III and its specifications for failure to state an offense; (10) whether the Government failed to disclose evidence as required under *Brady v. Maryland*, 373 U.S. 83 (1963); (11) whether the military judge erred in admitting a "911 phone call" into evidence; (12) whether the cumulative effect of errors substantially impaired the fairness of Appellant's trial; (13) whether the reference in the court-martial transcript to Appellant being arraigned by a special court-martial meant that the general court-martial that

---

[1] References to Article 120, UCMJ, are to the version found in the *Manual for Courts-Martial, United States* (1998 ed.). All other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), unless otherwise indicated.

[2] The court members found Appellant not guilty of one specification of conduct unbecoming an officer and a gentlemen in violation of Article 133, UCMJ, 10 U.S.C. § 933.

tried him lacked jurisdiction or that his sentence to confinement and a dismissal were unlawful; and (14) whether the staff judge advocate (SJA) misadvised the convening authority that the maximum punishment in Appellant's case was death.[3] Applying our superior court's holding in *United States v. Mangahas*, 77 M.J. 220, 224–25 (C.A.A.F. 2018), *overruled by United States v. Briggs*, ___ U.S. ___, 141 S. Ct. 467, 474 (2020), this court ruled in Appellant's favor with respect to issue (1) and set aside the findings of guilty as to Charge II and its Specification. In addition, this court set aside the finding of guilty as to Specification 2 of Charge III as factually insufficient, and excepted and substituted certain language in the Specification of Charge I on the basis of legal and factual insufficiency, setting aside the excepted language. With respect to the remaining issues, this court found Charge I and its Specification (as modified) and Specifications 1, 3, and 5 of Charge III were legally and factually sufficient. In addition, this court found that issue (3) lacked merit, that Appellant was not entitled to relief for issue (7), and that issue (8) was mooted by the resolution of issue (1). This court additionally decided issues (4) through (6) and (9) through (14) "warrant[ed] no further discussion or relief." This court set aside the sentence, dismissed Charge II and its Specification and Specification 2 of Charge III with prejudice, and returned the record to The Judge Advocate General "for further processing consistent with [its] opinion." *United States v. Daniels*, No. ACM 39407, 2019 CCA LEXIS 261 (A.F. Ct. Crim. App. 18 Jun. 2019) (unpub. op.), *rev'd*, 81 M.J. 64 (C.A.A.F. 2021).

The Judge Advocate General certified Appellant's case for review by the United States Court of Appeals for the Armed Forces (CAAF) which, in light of its decision in *Mangahas*, summarily affirmed this court's decision. *United States v. Daniels*, 79 M.J. 150 (C.A.A.F. 2019) (mem.), *rev'd*, ___ U.S. ___, 141 S. Ct. 467 (2020).

The Government then filed a petition for writ of certiorari with the United States Supreme Court, which granted the petition, reversed the CAAF's judgment, and remanded Appellant's case for further proceedings. *Briggs*, 141 S. Ct. at 474. On remand to the CAAF, our superior court vacated its prior ruling, reversed this court's opinion "as to Charge II and its Specification," and returned the record of trial to The Judge Advocate General for remand to this court "for a new review under Article 66," UCMJ, 10 U.S.C. § 866. *United States v. Daniels*, 81 M.J. 64 (C.A.A.F. 2021) (mem.).

---

[3] Appellant personally raised issues (8) through (14) pursuant to *United States v. Grostefon*, 12 M.J. 431, 436 (C.M.A. 1982).

Upon remand to this court, Appellant now raises 15 issues: (1) whether Appellant's conviction for rape is legally and factually sufficient; (2) whether Appellant was denied his Fifth Amendment[4] right to speedy trial; (3) whether the record of trial is substantially complete; (4) whether a non-unanimous court-martial verdict is unconstitutional in light of *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020); (5) whether the military judge's instruction on reasonable doubt was constitutionally inadequate; (6) whether the court members failed to comply with the military judge's instructions on findings; (7) whether Appellant's lead civilian trial defense counsel was ineffective by failing to challenge a court member, failing to fully cross-examine the alleged rape victim, failing to request a certain findings instruction, failing to object to the alleged victim presenting her unsworn statement in question-and-answer format through trial counsel, and failing to disclose to Appellant a personal conflict of interest; (8) whether trial counsel engaged in improper findings, rebuttal, and sentencing argument; (9) whether "Appellant's court-martial was the product of racial discrimination;" (10) whether Appellant's convictions for negligent dereliction of duty and conduct unbecoming an officer and a gentleman are legally and factually sufficient; (11) whether Charge III and its specifications fail to state an offense; (12) whether trial defense counsel were ineffective for failing to move to dismiss Charge III and its specifications for failure to state an offense; (13) whether trial defense counsel were ineffective for failing to conduct an adequate background check of the alleged rape victim and her son; (14) whether the military judge erred by admitting a "911 phone call" and the transcript of Appellant's testimony in a criminal trial in civilian court; and (15) whether the effect of cumulative errors substantially impaired the fairness of Appellant's trial.[5] We have carefully considered Appellant's arguments with respect to issues (4), (5), (13), and (15) and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required in light of *Ramos*), *rev. granted*, ___ M.J. ___, No. 22-0193, 2022 CAAF LEXIS 529 (C.A.A.F. 25 Jul. 2022). We find no further error, beyond those addressed in this court's prior opinion, materially prejudicial to Appellant's substantial rights, and we affirm the findings, as modified, and the sentence, as reassessed.

---

[4] U.S. CONST. amend. V.

[5] Appellant personally raises issues (9) through (15) pursuant to *Grostefon*, 12 M.J. at 436.

## I. BACKGROUND

### A. Minot, North Dakota, July 1998

In 1998, Appellant was a lieutenant stationed at Minot Air Force Base (AFB), North Dakota. Appellant met TS at a gym in the town of Minot, North Dakota. At the time, TS was a college student and single mother of a young child, CS, who lived with her in a house in Minot. TS would see and speak with Appellant at the gym from time to time, and at some point they exchanged phone numbers.

On the night of 14 July 1998, Appellant called TS and asked if he could come to her house.[6] TS reluctantly agreed, and Appellant arrived between 2300 and midnight. CS was sleeping in TS's bedroom at the time. Initially, Appellant and TS sat together and listened to music and spoke about topics such as the gym, Appellant's work, and photo albums of pictures of CS. Neither Appellant nor TS were drinking alcohol. Eventually Appellant asked TS if he could stay the night at her house. TS was uncomfortable with this suggestion and initially told Appellant "no." However, Appellant persisted in asking. At trial, TS described their interactions at this point:

> [Appellant] kept on asking to stay the night. I was not comfortable with that and again, it was not a simple "no." He would keep asking. He just wouldn't take "no" as an answer and he would ask in different ways and he used the excuse, "It's too far to drive back to base this late. I don't want to risk it. I don't want to – can I stay the night? What's the big deal?" And I would say, "My son sleeps in my bed; there's nowhere else for you to sleep," . . . .
>
> . . . .
>
> . . . I told him, "I think it would be best if you left," and he kept saying, "Let me stay please. I promise I'll behave. We can just hold each other."

TS eventually "got tired of fighting the issue" and agreed to allow Appellant to stay the night. She and Appellant went upstairs to the bedroom where CS was sleeping on one side of TS's bed. TS lay down in the middle and Appellant lay down next to her on the opposite side from CS. TS was wearing "[g]ym shorts," a "tank top," and a sports bra; Appellant was wearing gym shorts and a shirt. TS later testified that she felt "safe" allowing Appellant to sleep on her bed because her son CS was present.

---

[6] The following account of the events on 14 and 15 July 1998 is based primarily on TS's testimony at Appellant's trial.

While Appellant and TS remained clothed, Appellant "tried to touch [her] a few times" and she "kept pushing him off." TS testified Appellant then "started kissing [her] and kissing all over [her] and he – he got on top of [her] for a minute and he shook like – like he was having an orgasm or something." Appellant then got off the bed and went into the bathroom. He returned "totally naked and had a condom on and he crawled back in bed and he started kissing all over [TS]." TS told him "no." However, she testified she was not able to resist physically because Appellant was much larger than her, and was "holding [her] down" with his body weight on top of her. Appellant pulled TS's shorts out of the way and inserted his penis in her vagina. TS testified the penetration "didn't last very long;" when it was over, Appellant lay next to TS and held her without saying anything. TS pretended to sleep but remained awake. TS's son CS did not awaken during this incident.

Appellant left TS's house early in the morning. TS testified Appellant called her "[t]he next day and acted like nothing happened." Initially, TS did not want to report the incident. However, one of TS's neighbors heard her crying inside her house and called her, and TS told the neighbor what had happened. The neighbor reported the incident to the civilian police in Minot, and TS was called to the police station. TS was jointly interviewed by the Minot police and the Air Force Office of Special Investigations (AFOSI). TS testified that after she told the police and AFOSI what happened, the police told her "it would be very hard to prove," which made TS feel like "nothing." She eventually decided not to "go forward" with the case. However, before she made that decision, and while the matter was still pending, Appellant called her. He asked her to drop the allegation because the sexual intercourse was consensual, a claim which made TS feel "angry" and "scared." Later in 1998, after TS declined to pursue charges, she moved to Florida with CS.

## B. Fairfax County, Virginia, December 2014

Appellant continued his career as an Air Force officer, and in November 2014 he was a lieutenant colonel stationed at Joint Base Andrews, Maryland. In that month, Appellant and DU[7] ended a romantic relationship. On or about 5 December 2014, DU reported to the Fairfax County (Virginia) Police Department (FCPD) that Appellant was stalking her.[8] As a result of DU's report, FCPD Detective EM had cameras set up outside DU's house in Alexandria, Virginia. In the early morning hours of 9 December 2014, the cameras photographed Appellant in the fenced-in area of the backyard of DU's house.

---

[7] DU was a reserve officer in the United States Army at the time.

[8] In 2015, Appellant was convicted in Fairfax County circuit court of a misdemeanor stalking offense.

On the morning of 16 December 2014, DU was driving in her neighborhood and called "911" from her vehicle to report that Appellant was following her in his car. Detective EM had a warrant issued for Appellant's arrest and contacted Appellant's chain of command at Joint Base Andrews. When Appellant arrived at the base's main gate, security forces detained him there. After Appellant's first sergeant came to the gate and talked with him, Appellant agreed to have the first sergeant drive him to an FCPD station in Alexandria.

Appellant arrived at the FCPD station around 1400, and Detective EM placed him under arrest. After escorting Appellant to an interview room, Detective EM advised him of his rights, which he acknowledged before he agreed to answer questions. Detective EM and another FCPD detective interviewed Appellant for approximately two hours. Appellant's answers to their questions formed the basis of four of the five specifications of conduct unbecoming an officer and a gentleman with which Appellant was subsequently charged and tried at his court-martial. Appellant remained confined at the Fairfax County Detention Center (FCDC) at that point.

On 17 December 2014, Detective EM and other FCPD personnel conducted a search of Appellant's off-base residence. During the search, FCPD personnel found documents with markings indicating they contained classified information. As a result, the FCPD contacted the AFOSI. AFOSI agents later went to Appellant's apartment and seized the documents, which became the subject of the single specification of negligent dereliction of duty with which Appellant was charged and tried at his court-martial.

On 18 December 2014, while still at the FCDC, Appellant called his civilian friend, SM. Appellant asked SM to call Appellant's supervisor, Colonel (Col) KB, on his behalf and request ten days of emergency leave so that Appellant could take care of a "personal" and "medical" situation. SM wanted to include Appellant in a three-way call but was unable to do so. She was able to contact Appellant's command and submit his leave request, which Col KB denied. Appellant's request for SM to contact Col KB—specifically his request that SM misrepresent the basis for the emergency leave request—formed the basis of the fifth specification of conduct unbecoming an officer and gentleman with which Appellant was charged and tried at his court-martial.

During Detective EM's investigation of the stalking allegation, AFOSI provided her a 1998 report of an investigation by the AFOSI and Minot police regarding TS's allegation that Appellant raped her. In 2015, Detective EM contacted TS about the 1998 incident. TS agreed to go forward with the original rape allegation, which became the single specification of rape with which Appellant was charged and tried at his court-martial.

## II. DISCUSSION

### A. *Res Judicata*

As an initial matter, we note Appellant has reasserted a number of issues this court previously decided against him in our prior opinion, specifically issues (6), (10), (11), (12), and (14) in his current assignments of error. *See Daniels*, unpub. op. at *9–20. We further note the CAAF's opinion remanding Appellant's case to this court "for a new review under Article 66," UCMJ, specifically reversed this court's prior opinion only "as to Charge II and its Specification," leaving this court's prior adjudication of these distinct issues intact. *Cf. United States v. Ruppel*, 49 M.J. 247, 253 (C.A.A.F. 1998) (explaining the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). Appellant recognizes this point and, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982),[9] personally asserts this court's prior adjudication of these issues amounts to a "manifest injustice." *Cf. United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002) (explaining the law of the case doctrine is to be applied unless the prior decision "is 'clearly erroneous and would work a manifest injustice' if the parties were bound by it" (quoting *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817 (1998)). We have considered Appellant's arguments and find no cause to alter this court's prior adjudication of these issues. Accordingly, we find they require neither further discussion nor relief.

### B. Legal and Factual Sufficiency of Appellant's Rape Conviction

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, ___ M.J. ___, No. 22-0111, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). Moreover, "an accused can properly

---

[9] With the exception of issue (6).

be convicted of a sexual offense on the word of a single victim alone." *United States v. Prasad*, 80 M.J. 23, 31 (C.A.A.F. 2020). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Appellant's conviction for rape in violation of Article 120, UCMJ, required the Government to prove: (1) that at or near Minot, North Dakota, on or about 14 July 1998, Appellant committed an act of sexual intercourse with TS; and (2) that the act of sexual intercourse was done by force and without consent. *See Manual for Courts-Martial, United States* (1998 ed.) (1998 *MCM*), pt. IV, ¶ 45.b.(1). With regard to force and lack of consent, the applicable version of the *MCM* provides, *inter alia*:

> Force and lack of consent are necessary to the offense. . . . The lack of consent required . . . is more than mere lack of acquiescence. If a victim in possession of his or her mental faculties fails to make lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that the victim did consent. Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the victim is unable to resist because of the lack of mental or physical faculties. In such a case there is no consent and the force involved in penetration will suffice. All the surrounding circumstances are to be considered in determining whether a victim gave consent, or whether he or she failed or ceased to resist only because of a reasonable fear of death or grievous bodily harm.

1998 *MCM*, pt. IV, ¶ 45.c.(1)(b). "'[M]easures of resistance' can be verbal, physical[,] or a combination of the two." *United States v. Leak*, 61 M.J. 234, 245–46 (C.A.A.F. 2005). "Moreover, proof of resistance in any form is not a necessary element of the offense of rape." *Id.* at 246. (citation omitted). "Whether the elements of the offense are met is based on a totality of the circumstances." *Id.* at 245. (citation omitted).

**2. Analysis**

The Government introduced sufficient evidence for a rational factfinder to find Appellant guilty beyond a reasonable doubt. TS testified that Appellant penetrated her vagina with his penis without her consent. TS further testified she manifested her lack of consent by telling Appellant "no," and that she was not able to resist physically because he was much larger than her, his body weight was "[o]n top of [her]," and he was "holding [her] down." Thus, the Government introduced sufficient evidence for the court members to find Appellant committed an act of sexual intercourse with TS by force and without her consent. The court members might also have reasonably considered that the presence of TS's child CS on the bed next to Appellant and TS originally caused TS to be less concerned that Appellant would try to initiate sexual intercourse, as well as made it less likely TS would consent to sexual intercourse under those circumstances. In addition, the court members might reasonably have found the fact that TS reported the rape relatively soon after the offense in 1998, albeit reluctantly, lent additional credibility to her testimony in 2017.

Appellant raises several arguments as to why the evidence is insufficient. We address the most significant of these in turn.

Appellant contends TS's description of the offense is simply not sufficiently credible. Appellant argues TS's testimony that, while clothed on the bed, he shook "like he was having an orgasm or something," and *then* went into the bathroom to put on a condom "does not make sense." We are not persuaded that TS's description of her impression of Appellant's behavior fatally undermines her testimony. Appellant also points to TS's testimony that she acquiesced to Appellant's request to spend the night, and that she is a "nurturer" and a "pleaser" by nature and dislikes confrontation, as indicating she likely either consented or acquiesced to sexual intercourse with Appellant, or gave him an honest and reasonable belief that she consented. However, we are not persuaded such speculation overcomes TS's direct testimony that she told Appellant "no," and related circumstances—such as the presence of CS on the bed—all of which lends credibility to TS's lack of consent.

Appellant asserts TS had at least three motives to falsely accuse Appellant. First, he contends TS may have been angry or resentful that Appellant talked her into consensual sexual intercourse that she later regretted. However, the

court members could have reasonably concluded this was an unlikely motive for falsely accusing someone of a serious crime and committing perjury for little apparent material benefit. Second, Appellant suggests TS might have sought "retaliation" for an incident after she reported the offense, but before she left Minot, when she found all four tires on her car "slashed;" TS suspected Appellant of causing the damage but did not accuse him. However, the force of this argument is largely blunted by the fact that this incident occurred *after* TS reported Appellant's offense to the Minot police. Third, Appellant cites a brief portion of TS's cross-examination where trial defense counsel asked whether TS asked an attorney friend of hers in 2015 whether TS "had a civil case against" Appellant, and TS responded that she "probably discussed all [her] options because [she] was curious." However, the record contains no evidence that TS actually attempted to initiate a civil action against Appellant or even believed she retained such a cause of action in 2015. In addition, similar to the slashed-tires theory, the force of this argument is diminished by the fact TS had already reported the offense in 1998 soon after it occurred.

Appellant also attacks TS's credibility by pointing to an affidavit TS signed in June 2015, in which she indicated that in 1998 she "was asked to take a lie detector and [she] was later told that [she] passed." On cross-examination, TS testified that she had in fact never taken a "lie detector test." TS was not asked for, and did not provide, an explanation for this apparently untrue statement in her affidavit, and the court members could certainly weigh it when assessing her credibility. However, this discrepancy did not directly contradict TS's testimony regarding the rape itself. The court members who saw TS testify could reasonably conclude her testimony regarding the elements of the offense was credible, notwithstanding her statement about being informed of the results of a lie detector test 17 years earlier.

In addition, Appellant contends the Government introduced insufficient evidence that Appellant used "force," citing this court's unpublished en banc opinion in *United States v. Soto*, No. ACM 38422, 2014 CCA LEXIS 681 (A.F. Ct. Crim. App. 16 Sep. 2014) (en banc) (unpub. op.), *aff'd*, 74 M.J. 350 (C.A.A.F. 2015) (mem.). In *Soto*, this court found the appellant's rape conviction factually insufficient because "[t]he Government's evidence [wa]s too thin to satisfy us beyond a reasonable doubt that the appellant used force to cause the sexual conduct."[10] *Id*. at *15. The court explained that "the Government elicited only cursory information about the intercourse that was charged as rape." *Id*. at *10. In particular, the court explained:

---

[10] "The appellant was convicted of causing [the alleged victim] to engage in sexual intercourse 'by using physical strength or power or restraint applied to her person sufficient that she could not avoid or escape the sexual contact.'" *Soto*, unpub. op. at *8.

> The Government elicited three primary pieces of evidence about the charged act itself to build its case: 1) [the alleged victim] told the appellant "No, I'm not ready" at some point after the appellant began his advances; 2) [she] pushed the appellant while he was on top of her in an unsuccessful attempt to get the appellant off her; and 3) [she] was afraid during the encounter. The testimony on each point was extremely brief and left several questions unanswered. . . . [The alleged victim] testified that she pushed the appellant while he was on top of her, but trial counsel did not elicit sufficient evidence to indicate that the appellant used force to overcome the pushing.

*Id*. at *12–13. Appellant cites *Soto* for the proposition that "being 'on top' and being 'heavy' is simply too ambiguous to sufficiently describe 'force.'"

We are not persuaded. In Appellant's case, evidently unlike *Soto*, TS testified that she was not able to physically resist "at all" because Appellant was "holding [her] down" and had his body weight "[o]n top of [her]." Thus by "holding [her] down," Appellant, who was much larger than TS, used physical force to accomplish the sexual act beyond "the incidental force involved in penetration." *See United States v. Bonano-Torres*, 31 M.J. 175, 179 (C.M.A. 1990) (citation omitted). We are also unpersuaded by Appellant's argument that under the law as it existed in 1998, TS was "obligated" to use the "opportunity" of Appellant going into the bathroom "to escape." At that time, TS did not know that Appellant was going to assault her when he returned. More to the point, the elements of the offense do not require the Government to disprove that the victim might have avoided the rape by some other course of action. What is required is that the Government prove Appellant accomplished the sexual act by using physical or constructive force sufficient to overcome the victim's resistance, and in this case the Government introduced such evidence through TS's testimony.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for rape. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the court members personally observed the witnesses and we did not, we also find the evidence of rape factually sufficient.

**C. Speedy Trial**

**1. Additional Background**

The charged rape occurred in mid-July 1998. The AFOSI initiated its investigation on 24 July 1998, and the AFOSI and Minot police jointly interviewed TS on that date. On the same day, 24 July 1998, TS informed the Minot

police that she wanted to "drop" the case against Appellant because "she was afraid of the Air Force's involvement" and felt "the Air Force would not believe her and would protect" Appellant. On 25 July 1998, TS changed her mind and told the Minot police she wanted to "press charges" against Appellant. On 6 August 1998, TS changed her mind again and told the civilian authorities she wanted to drop the case and intended to leave the area, and the Minot police closed the case on 7 August 1998. AFOSI agents attempted to contact TS to confirm her decision to drop her complaint against Appellant. On 2 September 1998, TS told the AFOSI directly that she did not want to pursue a prosecution of Appellant.

As described above, FCPD Detective EM's investigation of DU's December 2014 stalking complaint against Appellant led Detective EM to speak with TS in 2015 about the 1998 incident. In 2015, TS agreed to cooperate with a prosecution. The court-martial charges were preferred against Appellant on 22 June 2016, and referred for trial by general court-martial on 16 August 2016. Appellant was arraigned on 20 September 2016.

On 16 November 2016, the Defense filed a "Motion to Dismiss for Denial of Right to Speedy Trial and Statute of Limitations."[11] With respect to the right to speedy trial, the Defense contended the Government had violated Appellant's due process right to a speedy trial under the Fifth Amendment. Specifically, the Defense asserted the pretrial delay following TS's initial report of the offense was "egregious" due to its length, and that Appellant was prejudiced because the very limited investigation that took place in 1998 and the passage of time had diminished or eliminated the Defense's ability to impeach TS. The Government opposed the defense motion, essentially arguing that the passage of time alone does not demonstrate that a delay is "egregious," and that the Defense failed to identify any particular witness or item of evidence that had been lost due to the delay.

Judge Moore held a motion hearing on 1 December 2016, at which the parties presented argument on the Defense's speedy trial motion. During the hearing, trial defense counsel elaborated on the Defense's prejudice argument, proffering that one of the Minot police detectives involved in the 1998 investigation had died during the intervening years, that another civilian detective had no independent memory of the case before she reviewed the 1998 police report, and that the agent who wrote the AFOSI report of investigation had not been located.

---

[11] A portion of this motion dealt with the applicable statute of limitations for the charged offense of rape, which was the subject of the prior appellate litigation, was ultimately resolved against Appellant's position, and is no longer relevant to our analysis at this point.

Judge Moore did not issue a ruling on the speedy trial motion on 1 December 2016. He evidently provided the parties a written ruling dated 22 December 2016 in which he denied the motion to dismiss, but this ruling was omitted from the record of trial—a distinct error asserted by Appellant that we separately address, *infra*. Appellant's court-martial resumed on 5 June 2017 with a different trial judge.

**2. Law**

An accused's right to speedy trial is protected by statute, by regulation, and by the Constitution. *United States v. Tippit*, 65 M.J. 69, 72 (C.A.A.F. 2007); *United States v. Reed*, 41 M.J. 449, 451 (C.A.A.F. 1995)). "Absent restraint, the 'primary guarantee' . . . against *pre-accusation delay* is the statute of limitations." *Reed*, 41 M.J. at 451 (emphasis added) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). The Fifth Amendment Due Process Clause also affords criminal defendants some protection against pre-preferral delay in the absence of pretrial restraint. *See United States v. Lovasco*, 431 U.S. 783 (1977); *United States v. Vogan*, 35 M.J. 32, 34 (C.M.A. 1992). In order to demonstrate a speedy trial violation under the Fifth Amendment, "the defendant has the burden of proof to show an egregious or intentional tactical delay and actual prejudice." *Reed*, 41 M.J. at 452. For example, with respect to the reason for delay, "[t]here may be a due process violation when [delay is] 'incurred in wreckless [sic] disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.'" *Id*. (quoting *Lovasco*, 431 U.S. at 795 n.17). With respect to prejudice, "the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost" is not by itself "enough to demonstrate that [an accused] cannot receive a fair trial and to therefore justify the dismissal of the indictment" on Fifth Amendment due process grounds. *United States v. Marion*, 404 U.S. 307, 326 (1971). "Speculation by the defendant is not sufficient. The defense may establish prejudice by showing: (1) the actual loss of a witness, as well as the substance of their testimony and the efforts made to locate them; or (2) the loss of physical evidence." *Reed*, 41 M.J. at 452 (internal quotation marks and citations omitted).

**3. Analysis**

On appeal, Appellant reasserts that the approximately 18-year delay between TS's report that Appellant raped her in July 1998 and the initiation of his prosecution in 2016 violated his Fifth Amendment due process right to a speedy trial. We find Appellant has failed to meet his burden to demonstrate an egregious or intentional tactical delay.

As an initial matter, we must determine the appropriate standard of review. Appellant suggests that we should review the military judge's denial of the Defense's speedy trial motion for an abuse of discretion. *See United States v. Fuzer*, 18 F.3d 517, 519 (7th Cir. 1994). The Government suggests de novo is the appropriate standard. *Cf. United States v. Cooper*, 58 M.J. 54, 57 (C.A.A.F. 2003) ("In the military justice system . . . the standard of review on appeal for speedy trial issues is de novo."). Under the circumstances of this case, where the military judge's ruling was not made part of the record, we find the appropriate standard is de novo, and without reference to the military judge's omitted ruling.

With respect to the nature of the delay, Appellant evidently relies on the length of the delay to prove it was "egregious." However, we doubt whether a delay that comports with the applicable statute of limitations is facially inappropriate as a matter of due process simply by virtue of its length. Moreover, in *Lovasco*, the United States Supreme Court held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796. In this case, both the North Dakota authorities and the Air Force ceased investigating and initially declined to prosecute the alleged rape because TS, the victim, clearly informed them she did not want to cooperate or proceed. We find the Government's decision not to proceed with prosecuting Appellant, in the context of a victim's desire not to prosecute or cooperate, and where she was essentially the only witness to the alleged offense, was reasonable. Such a delay is more akin to a legitimate investigative delay than to a "delay undertaken by the Government solely 'to gain tactical advantage over the accused.'" *Id.* (quoting *Marion*, 404 U.S. at 324).

Accordingly, because Appellant has failed to demonstrate an egregious or intentional tactical delay offensive to the Fifth Amendment, he is entitled to no relief and we need not reach the question of prejudice.

## D. Incomplete Record

### 1. Additional Background

As described above, Judge Moore's written ruling denying the Defense's "Motion to Dismiss for Denial of Right to Speedy Trial and Statute of Limitations" was not included in the record of trial. The record does not include either an oral or written reference to Judge Moore's ruling on the motion.

Although the parties did not raise the matter of the missing ruling during this court's initial review of Appellant's case, this court noted the omission. *Daniels*, unpub. op. at *7 n.5. However, this court explained that the resolution of the statute of limitations issue in Appellant's favor (at that point) in light of

*Mangahas*, 77 M.J. at 225, obviated any need to address the missing ruling. *Daniels*, unpub. op. at *7 n.5.

Upon remand, Appellant has now asserted the missing ruling is a substantial omission from the record of trial, and requests we set aside his conviction for Charge II and its Specification alleging rape, set aside the sentence, and affirm a sentence of no punishment. In response, the Government moved this court to attach to the record a sworn declaration from the trial counsel, Major (Maj) FR, dated 24 March 2022, which we granted. In his declaration, Maj FR explained that Judge Moore had provided his written ruling on the Defense's motion to the parties via email in late December 2016. Maj FR attached to his declaration a copy of Judge Moore's ruling, dated 22 December 2016, which Maj FR identified "to the best of [his] recollection" as "a true and accurate version" of the ruling.

**2. Law**

A complete record of the proceedings, including all exhibits, must be prepared for any general court-martial that results in a punitive discharge or more than 12 months of confinement. Article 54(c)(1), UCMJ, 10 U.S.C. § 854(c)(1); Rule for Courts-Martial (R.C.M.) 1103(b)(2). Whether a record of trial is complete is a question of law we review de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014) (citation omitted).

"[A] substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the [G]overnment must rebut." *United States v. Harrow*, 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006) (citation omitted), *aff'd*, 65 M.J. 190 (C.A.A.F. 2007). However, "[i]nsubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000) (holding that four missing prosecution exhibits were insubstantial omissions when other exhibits of similar sexually explicit material were included). We approach the question of what constitutes a substantial omission on a case-by-case basis. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). "In assessing either whether a record is complete . . . the threshold question is 'whether the omitted material was "substantial," either qualitatively or quantitatively.'" *Davenport*, 73 M.J. at 377 (quoting *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982)). "Omissions are quantitatively substantial unless 'the totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness.'" *Id.* (omission in original) (quoting *United States v. Nelson*, 13 C.M.R. 38, 43 (C.M.A. 1953)).

### 3. Analysis

As an initial matter, we clarify the significance of this court granting the Government's motion to attach Maj FR's declaration to the record, with a purported copy of Judge Moore's motion ruling attached. As we explained in similar circumstances in *United States v. King*, No. ACM 39583, 2021 CCA LEXIS 415, at *29 (A.F. Ct. Crim. App. 16 Aug. 2021) (unpub. op.), *pet. granted on other grounds*, ___ M.J. ___, No. 22-0008, 2022 CAAF LEXIS 227 (C.A.A.F. 22 Mar. 2022):

> We understand this to mean that we can consider the written ruling in deciding whether the Government has rebutted the presumption of prejudice on appeal. To be clear, we are not holding that the record of trial is now complete with [the] ruling added . . . . If the Government sought to make the record of trial complete, it should have requested our court order a certificate of correction.

Similar to *King*, although the omission from the record of trial remains, we have considered Maj FR's declaration and its attachment in assessing the significance of the omission.

We find the omission to be substantial; the Government does not contend otherwise. The omitted ruling explained Judge Moore's resolution of a constitutional issue of vital significance to the allegation that Appellant raped TS— by far the most serious of the alleged offenses—contrary to the Defense's position. The omitted ruling was both qualitatively substantial, in that it was important, and quantitatively substantial, in that its extent did not approach "nothingness." *See Davenport*, 73 M.J. at 377.

However, having found a substantial omission, we further find the Government has successfully rebutted the presumption of prejudice. Although Judge Moore's denial of the motion is not explicitly stated in the record, it was implicitly obvious from the fact that Appellant's court-martial proceeded to trial. Moreover, the Defense's motion and the Government's response, the underlying evidence, and the parties' arguments at the 1 December 2016 motion hearing are all available for this court to perform a de novo review of the matter, *supra*, and ensure Appellant was not unfairly prejudiced by the omitted ruling.

We note this situation with Judge Moore's motion is unlike one of the missing motion rulings in *King*, with respect to which this court found the Government failed to rebut the presumption of prejudice. *King* addressed two missing rulings: one regarding alleged unreasonable multiplication of charges (UMC), and one regarding alleged illegal pretrial punishment. 2021 CCA LEXIS 415, at *15–30. This court found the Government successfully rebutted the presumption of prejudice with regard to the latter, but not with regard to the UMC

motion. Unlike the pretrial punishment ruling, the Government was not able to recover a copy of the UMC motion to attach to the record. Moreover, we noted the UMC motion raised a significant question of fact, and without the ruling we could not determine how the military judge resolved that factual question. In contrast, in Appellant's case there were no material factual disputes as both parties relied on the same source documents regarding events in 1998—the AFOSI and Minot police reports of investigation. Moreover, unlike the missing UMC ruling in *King*, the Government has produced a copy of Judge Moore's missing ruling which, although insufficient to cure the omission in the record, informs our conclusion that the omission of the ruling has not prejudiced our ability to review Appellant's convictions and sentence in accordance with Article 66, UCMJ, 10 U.S.C. § 866, nor materially prejudiced Appellant with respect to any stage of his court-martial or post-trial or appellate review.

Accordingly, we find Appellant is not entitled to relief due to the omission of Judge Moore's ruling on the Defense's speedy trial motion.

## E. Ineffective Assistance of Counsel

### 1. Additional Background

Appellant asserts his trial defense counsel were ineffective in the following respects: (1) they failed to challenge a court member, Col JC; (2) they failed to fully cross-examine the alleged rape victim, TS; (3) they failed to request a particular findings instruction; (4) they failed to object to TS presenting her unsworn statement in question-and-answer format through trial counsel; and (5) Appellant's lead civilian trial defense counsel failed to disclose to Appellant a personal conflict of interest.

This court ordered and received sworn declarations from Appellant's two civilian and one military trial defense counsel—Mr. AC, Mr. BB, and Maj AD—responsive to Appellant's claims of ineffective assistance, which we have considered in relation to these issues.[12] *See United States v. Jessie*, 79 M.J. 437, 442–44 (C.A.A.F. 2020). We address each of Appellant's assertions in turn in our analysis below.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v.*

---

[12] We have considered whether a post-trial evidentiary hearing is required to resolve discrepancies between these declarations, Appellant's own sworn declaration, and other matters in the record. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam). We conclude such a hearing is not required for the reasons explained in the following analysis.

*Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if trial defense counsel were ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). With respect to prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* (quoting *Strickland*, 466 U.S. at 694).

### 3. Analysis

#### a. Failure to Challenge Col JC

During voir dire, one of the court members, Col JC, disclosed that he had served a total of "probably close to 28 years" as an enlisted member and officer in the security forces career field. On appeal, Appellant asserts that he was not "comfortable" with Col JC remaining on the panel, and that he instructed trial defense counsel to challenge Col JC. However, trial defense counsel did not challenge Col JC either for cause or peremptorily.[13] Appellant asserts trial defense counsel "should have at least attempted to challenge Col JC for cause" in order to preserve the issue on appeal.

We are not persuaded. The declarations provided by trial defense counsel explain multiple reasons why they were not averse to Col JC serving on the panel. Col JC indicated he had primarily worked on the base security aspect of security forces and had little experience specifically with law enforcement or

---

[13] Trial defense counsel exercised the Defense's peremptory challenge against another potential court member.

criminal investigations. Trial defense counsel liked the fact that Col JC was a member of the Air National Guard rather than "part of the active component." Counsel's experience led them to believe that as a Guardsman, Col JC might be less "deeply inculcated into the mindset of Air Force leadership" than were active duty officers, and "more lenient on the non-sex-based officer misconduct allegations," in Mr. AC's words. In addition, trial defense counsel liked Col JC's "laid back and down to earth" demeanor, as Maj AD put it, and Col JC's actual responses to the voir dire questions revealed no substantial basis for a challenge for cause.

With regard to Appellant's assertion that he "instructed" trial defense counsel to challenge Col JC, both Mr. BB and Maj AD dispute this claim and recalled that Appellant agreed with the defense team's decisions on court member challenges. However, assuming *arguendo* Appellant's assertion is true, trial defense counsel are not bound to follow their client's recommendations or requests regarding court member challenges where such advice is contrary to counsel's best professional judgment. In other words, even if we assume Appellant's assertion that he told trial defense counsel to challenge Col JC was true, he would not be entitled to relief.

Accordingly, we find trial defense counsel made a reasonable decision not to challenge Col JC, and their performance was not deficient. In addition, Appellant has failed to demonstrate prejudice, i.e., a reasonable probability that a challenge for cause against Col JC would have been successful.

### b. Cross-Examination of TS

Mr. AC cross-examined TS. At one point in the cross-examination, Mr. AC asked TS whether she had reviewed a written transcript of her recorded interview with the Minot police in July 1998. TS indicated she had been provided with such a transcript, but she had not read it because she did not want to. Mr. AC then asked her a number of questions about statements she made during the 1998 interview, including some possible discrepancies with what she said in her 2015 affidavit, her pretrial interview with the Defense, or her trial testimony. Discrepancies that TS acknowledged included, *inter alia*, whether she and Appellant looked at the photo albums upstairs or downstairs, and whether she remembered how she and Appellant came to be upstairs. At other points, TS indicated she could not remember whether specific things were said during the 1998 interview—for example, whether she denied that she invited Appellant to stay the night, or whether she told the police Appellant asked her about birth control. At one point, Mr. AC told TS, "I can't show you the statement since you haven't reviewed it so I'm just asking you the question to the best of your memory and if you can't remember I very much understand."

Appellant asserts Mr. AC was ineffective because his statement that he could not show TS the transcript of the 1998 police interview was an incorrect statement of law. Appellant argues Mr. AC could have used the transcript of the 1998 police interview more effectively by either showing it to TS on the stand, or by requesting a recess so that TS could use it to refresh her memory. Appellant contends this would have allowed the Defense to "much more effectively" impeach TS through contradiction.

In their declarations, trial defense counsel assert Mr. AC conducted a well-prepared, thorough cross-examination of TS that reflected, in Mr. AC's words, a "strategic decision to highlight [her] lack of memory as much as possible." We agree, and find this was a reasonable strategic approach under the circumstances, including the nearly 19-year gap between the charged offense and the trial. Whether counsel's performance was deficient under prevailing norms is not determined by the existence of reasonable alternative potential strategies, nor by the degree of success of the strategy chosen. In addition, Appellant has failed to demonstrate a reasonable probability that his suggested course of action would have resulted in a more favorable outcome. Appellant's bare assertion that Mr. AC could have used the transcript of the 1998 interview more effectively offers no concrete examples as to how TS's testimony would have materially changed, and amounts to little more than speculation. Accordingly, we find Appellant has failed to demonstrate either deficient performance or prejudice.

### c. Findings Instruction

The military judge's instructions to the court members regarding the elements of the offense of rape included the following: "Both force and lack of consent are necessary to this offense. 'Force' is physical violence or power applied by the accused to the victim. An act of sexual intercourse occurs 'by force' when the accused uses physical violence or power to compel the victim to submit against her will."

During their deliberations on findings, the court members presented a question to the military judge: "[W]hat does the word 'power' mean? If possible provide examples." After discussing the members' question with counsel, the military judge explained to the court members the term "power" in relation to the elements of rape meant "actual physical force . . . . physical strength and force exerted by something or someone," as opposed to "constructive force like force through intimidation or threats or abuse of position or power." Neither party objected to this explanation or requested additional instructions in response to the members' question.

On appeal, Appellant asserts trial defense counsel were ineffective because they "did not ask the judge to instruct [the members] that 'power' did not include Appellant simply being on top of TS during a sexual encounter, as TS described." Appellant contends trial defense counsel could have cited *Soto*, unpub. op. at *10–16, discussed *supra* in relation to legal and factual sufficiency, "for the proposition that a vague description of the accused being on top of the complainant was insufficient to describe the kind of physical force or 'power' necessary to constitute 'rape.'"

We find Appellant's argument fails to demonstrate either deficient performance or material prejudice. Through their declarations, trial defense counsel indicate they believed the military judge provided adequate instructions on the elements of rape and related definitions and defenses; we agree. Appellant has not demonstrated the contrary. The fact that trial defense counsel did not request a tailored instruction modeled on the unpublished decision of this court in *Soto*, decided on the basis of factual sufficiency, does not demonstrate constitutionally deficient performance.

Moreover, assuming trial defense counsel had requested such an instruction, Appellant has not demonstrated a reasonable probability that: (1) the military judge would have given it, or erred by declining to do so; or (2) if given, the instruction would have resulted in a more favorable result. As to the first point, the proposed instruction Appellant describes is not the categorical principle of law Appellant portrays it to be. *Soto* does not hold that an accused's body weight cannot be used to apply force to overcome a victim's ability to resist; rather, it held the Government failed to elicit the necessary testimony to demonstrate the appellant used physical force to accomplish the sexual act in that case. *Id.* at *14–16.[14] Where the military judge's instructions were otherwise complete and accurate, injecting such an instruction as Appellant pro-

---

[14] *Cf. Soto*, unpub. op. at *15–16:

> Put simply, it appears the Government was so focused on explaining [the alleged victim's] actions after the charged act that it neglected to have the witness adequately detail the charged act itself in a manner that permits us to find the appellant applied strength, power, or restraint to [her], sufficient that she could not avoid or escape the sexual conduct.

poses would have been unnecessary at best, and potentially confusing or misleading.[15] As to the second point, the result in *Soto* was a fact-specific conclusion that the evidence in that case did not persuade the court of the appellant's guilt beyond a reasonable doubt. The substance of TS's testimony in the instant case is substantially stronger than that of the alleged victim in *Soto* on the question of whether Appellant held TS down with sufficient force to overcome her ability to resist. Appellant was not only on top of TS and physically much larger than her; unlike the alleged victim in *Soto*, TS testified Appellant held her down such that she was not able to physically resist "at all."

Accordingly, we find Appellant is entitled to no relief on this basis.

### d. TS's Unsworn Statement

During presentencing proceedings, trial defense counsel objected to TS being permitted to give an unsworn statement to the court pursuant to R.C.M. 1001A on the grounds that the rule did not exist and unsworn victim statements were not authorized at the time of the offense in 1998. Trial defense counsel also objected to TS providing her unsworn statement orally in a question-and-answer format, on the grounds that R.C.M. 1001A did not specifically enumerate such an option, and to not being given an advance written copy of the unsworn statement. The trial judge ultimately overruled the first two objections, but she did require TS to present her oral unsworn statement in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session before providing it to the court members. During this Article 39(a), UCMJ, session, the military judge observed that R.C.M. 1001A(e)(2) "seem[ed] to require the victim's own counsel do the questioning." In response, trial defense counsel clarified that the Defense "d[id] not have an objection to the government counsel doing the question and answer." After trial counsel additionally represented that the proposed question-and-answer presentation had been coordinated with TS's Special Victims' Counsel (SVC) and that it was what TS wanted, the military judge allowed it.

On appeal, Appellant contends trial defense counsel were ineffective by not objecting to trial counsel's participation in TS's question-and-answer oral unsworn statement. Appellant cites CAAF precedent holding that "the right to be reasonably heard provided by R.C.M. 1001A (2016) belongs to the victim, not to the trial counsel." *United States v. Hamilton*, 78 M.J. 335, 342 (C.A.A.F.

---

[15] The Government also notes the rape charge at issue in *Soto* related to a different version of Article 120, UCMJ, than that at issue in Appellant's case, further attenuating *Soto*'s relevance as the source of useful findings instructions. *See Soto*, unpub. op. at *8 ("The appellant was convicted of causing [the alleged victim] to engage in sexual intercourse 'by using physical strength or power or restraint applied to her person sufficient that she could not avoid or escape the sexual contact.'").

2019) (citation omitted). In addition, he cites this court's opinion in *United States v. Bailey*, No. ACM 39935, 2021 CCA LEXIS 380, at *15 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.), which found permitting trial counsel and trial defense counsel to present the victims' unsworn statements to the court by reading them was plain error; and the decision of the Army Court of Criminal Appeals in *United States v. Cornelison*, 78 M.J. 739, 744 (A. Ct. Crim. App. 2019), which held specifically that the military judge erred by permitting trial counsel to "participate" in the victim's oral question-and-answer unsworn statement.

We acknowledge the state of the law on this point, at least in Air Force courts-martial, is unsettled. *See United States v. Harrington*, ___ M.J. ___, No. 22-0100, 2022 CAAF LEXIS 201 (C.A.A.F. 14 Mar. 2022) (granting review on the issue of "whether the military judge abused his discretion in allowing the victim's parents to take the witness stand and deliver unsworn statements in a question-and-answer format with trial counsel"). However, assuming for purposes of analysis that the Defense could have raised a valid objection to trial counsel posing the questions in TS's oral question-and-answer unsworn statement, Appellant still fails to demonstrate deficient performance. In their declarations, all three trial defense counsel state Mr. AC made a "strategic decision" not to object to trial counsel's participation. As Mr. AC explained, the evident alternative was that TS's SVC would conduct the questioning, and trial defense counsel believed questioning by the trial counsel would lead to a "more tightly constrained" and "less emotional" unsworn statement, which was preferable from the Defense's perspective. We find this was a reasonable strategic decision to forego the objection. *See Mazza*, 67 M.J. at 475.

Appellant also fails to meet his burden to demonstrate a reasonable probability of a more favorable result had the objection been made. Appellant contends TS had not prepared an alternative unsworn statement, and thus if the objection were sustained the Defense could have prevented TS from making an unsworn statement entirely. We are not persuaded. All three trial defense counsel perceived that the alternative to trial counsel conducting the questioning was that the SVC would do it. We find this plausible; we doubt that the military judge would penalize TS, the rape victim, for trial counsel's error by causing her to forfeit the opportunity to provide an unsworn statement to the court members.

### e. Mr. AC's Alleged Conflict of Interest

One of the issues Appellant raised in his initial appeal to this court was that "trial defense counsel were ineffective for failing to move to dismiss Charge III and its specifications [alleging violations of Article 133, UCMJ,] for failure to state an offense." *Daniels*, unpub. op. at *3. In response to an order from this court, Mr. AC provided a responsive declaration dated 3 August 2018

which explained, *inter alia*, that such a motion—at the time Appellant asserted it should have been filed—would have been untimely. Mr. AC further explained that the trial judge in Appellant's case, Judge Richardson, had previously held him in contempt of court in an earlier trial for filing an untimely motion to dismiss, a ruling that this court subsequently reviewed favorably. *See United States v. Marsh*, No. ACM 38688, 2016 CCA LEXIS 244, at *5–11 (A.F. Ct. Crim. App. 19 Apr. 2016) (unpub. op.).

Mr. AC and Mr. BB did not represent Appellant at the time of his arraignment on 20 September 2016 or the motions hearing on 1 December 2016. Near the outset of the next session on 5 June 2017, where Mr. AC and Mr. BB initially appeared in court on behalf of Appellant, the Defense challenged Judge Richardson on the basis of bias against Mr. AC personally. Mr. AC explained:

> The basis for that challenge -- although, Your Honor and myself, we've had, I think, very pleasant and cordial conversations off the record. I think that there is a history of some contention on the record that has in prior matters been somewhat palpable to others and has been noted in some appeals that have been filed recently. And while in those cases, I didn't previous[ly] challenge you, the fact that I've been essentially put on notice by a couple of appellate counsel recently of some opinions of that matter, it's our position that this court holds a bias against myself personally, and therefore, we challenge you, Your Honor.

Judge Richardson denied the challenge:

> I understand where you're coming from, Mr. [AC]. I – this is the fourth court-martial, I believe in which you've appeared before me. And in the first, I agree there were some palpable issues. There were zero issues in the next court and in the next court and there have been none here. And I have said that I – if I were an accused, I might want to hire you as my lawyer, so I do have a great deal of respect for you. And I do not allow what happened in that first court-martial to color our subsequent interactions.
>
> [ ] I am satisfied that there – that I am impartial, and that an objective observer, if they really knew all of the facts, which is not just the first court-martial, but the second and the third, would have no question about my ability to be fair and impartial as a military judge. So I'm denying the [D]efense's challenge.

In his current appeal, Appellant contends that Mr. AC's 3 August 2018 declaration indicated he effectively had a conflict of interest that prevented him from zealously pursuing a motion to dismiss Charge III and its specifications,

because "he did not want to be reprimanded again by this military judge." Appellant further asserts Mr. AC "did not disclose the specifics of this conflict of interest to Appellant," and he maintains that had Mr. AC done so, Appellant would have sought different counsel to represent him.

We find Appellant has failed to demonstrate either deficient performance or prejudice with respect to Mr. AC's alleged conflict of interest. First, we note that Appellant's claim of a conflict is a very narrow one—specifically with regard to Mr. AC's alleged reluctance to file an untimely motion to dismiss with Judge Richardson. Next, we note that Mr. AC specifically refutes Appellant's claim that Appellant was not informed about Mr. AC's prior clash with the military judge. Mr. AC asserts, "Appellant was fully advised about [Mr. AC's] prior dealings with the military judge, including the specific details of the past negative and positive interaction . . . and he was invited to ask additional questions if he desired." Both Mr. BB and Maj AD agree Mr. AC did specifically disclose his prior controversy with Judge Richardson to Appellant, who did not appear concerned at the time. However, we need not definitively resolve this factual dispute because Appellant's claim fails for other reasons.

Mr. AC's 3 August 2018 declaration does not indicate a conflict of interest. Rather, it explains, in part, why Mr. AC believed—based on hard experience— that the proposed motion to dismiss would have been likely to fail, particularly in an Air Force court-martial before Judge Richardson. Moreover, Mr. AC's 3 August 2018 declaration further indicates he had reached the conclusion that such a motion was likely without substantive merit even if timely filed, and that a successful motion might merely have provided the Government the opportunity to correct the issue by charging the offenses under Article 134, UCMJ, rather than Article 133, UCMJ, which would have increased Appellant's punitive exposure. *Compare Manual for Courts-Martial, United States*, 2016 ed. (2016 *MCM*), pt. IV, ¶ 59.e., *with* 2016 *MCM*, pt. IV, ¶ 96.e. Mr. AC explained that trial defense counsel's decision not to move to dismiss Charge III (conduct unbecoming an officer and a gentleman) was communicated to Appellant, along with the rationale that the current charging scheme lowered his punitive exposure if he were convicted. These were legitimate strategic considerations, and Appellant has not demonstrated these conclusions fell measurably below the expected standard of performance.

Finally, and perhaps most importantly, this court's prior opinion held that Appellant was entitled to no relief for his claim that Specifications 1, 3, and 5 of Charge III failed to state an offense. *Daniels*, unpub. op. at *17–20. This court concluded that even if Specifications 1 and 3 erroneously omitted a terminal element from Article 134, UCMJ, the omission did not materially prejudice Appellant's substantial rights. *Id.* at *19 (citing *United States v. Tunstall*, 72 M.J. 191, 196 (C.A.A.F. 2013)). With regard to Specification 5, this court

determined the claim was substantively without merit. *Id*. at *20.[16] Therefore, Appellant cannot demonstrate that, but for the alleged error that prevented the motion to dismiss Charge III and its specifications being filed, there was a reasonable probability of a more favorable result. Accordingly, Appellant is entitled to no relief.

## F. Trial Counsel Argument

Appellant asserts various portions of trial counsel's closing, rebuttal, and sentencing arguments were improper. With respect to trial counsel's closing and rebuttal arguments on findings, we note this court previously reviewed the same alleged errors and found them to be without merit in its original review of Appellant's case. *Daniels*, unpub. op. at *2–3. We find no cause to revisit that prior adjudication. *Cf. Ruppel*, 49 M.J. at 253.

However, on remand Appellant has raised an additional argument: that trial counsel's sentencing argument was also improper. Accordingly, we consider this assignment of error below.

### 1. Additional Background

During his sentencing argument, trial counsel argued the following:

> [T]he main reason why you should dismiss [Appellant] is the message that you send if you do not. We call our law "The Uniform Code of Military Justice." We call it that because it's uniform, the same for all services. A crime in the Army is a crime in the Air Force and so on but for real justice to prevail, we have to make our laws uniform, not just between services but between [sic] our service. When it comes to justice, "uniform" should mean just that. What's wrong is wrong for everyone but if [Appellant] is not dismissed today, you know what people will think. He qualifies for some sort of exception. Of course he got off easy, he's a Lieutenant Colonel. Of course he got off easy, he's close to retirement.
>
> Now, maybe you think our Uniform Code is not uniform after all. [Appellant] raped a woman. [Appellant] was derelict in his duties and of [sic] conduct unbecoming an officer. He has bookended his career with these crimes. He and not this court has

---

[16] We recognize that this court's prior opinion reviewed the alleged failure to state an offense under the plain error standard, because the issue was not raised at trial. *Daniels*, unpub. op. at *17–20. However, its clear holdings that any error with regard to Specifications 1 and 3 was harmless, and that the allegations with respect to Specification 5 were definitively without merit, signaled that we would deny Appellant relief under any standard of review.

thrown away those 20 years. He, not this court lost his retirement, forfeited all links to the military. He must be dismissed.

Trial counsel recommended the court members impose a sentence of confinement for 20 years and a dismissal.

Trial defense counsel did not object to trial counsel's sentencing argument. The Defense recommended a sentence of confinement for one year, and asserted a dismissal would be "absolutely outrageous and inappropriate."

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). Under plain error review, the appellant bears the burden to demonstrate error that is clear or obvious and results in material prejudice to his substantial rights. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). "[T]rial counsel may 'argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.'" *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). However, trial counsel may not "threaten the court members with the specter of contempt or ostracism if they reject" trial counsel's recommendation. *United States v. Norwood*, 81 M.J. 12, 21 (C.A.A.F. 2021) (citation omitted). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted).

Relief for improper argument will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (*i.e.*, resulted in prejudice)." *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5). "[I]n the context of an allegedly improper sentencing argument, we consider whether 'trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that [the appellant] was sentenced on the basis of the evidence

alone.'" *Halpin*, 71 M.J. at 480 (second alteration in original) (additional internal quotation marks omitted) (quoting *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007)). In assessing prejudice from improper sentencing argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the sentence. *See id.* (citing *Fletcher*, 62 M.J. at 184). "[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *Gilley*, 56 M.J. at 123 (additional internal quotation marks omitted) (quoting *United States v. Carpenter*, 51 M.J. 393, 396 (1999)).

### 3. Analysis

Appellant contends it "appears" the court members were induced, at least in part, "to include a dismissal as part of Appellant's sentence based on trial counsel's improper argument for 'real justice,' a 'uniform' sentence (when Appellant was entitled to 'individualized consideration'), and that the panel members would be criticized by others if they did not dismiss him." We are not persuaded.

The court members convicted Appellant of committing rape against TS, in addition to negligent dereliction of duty and multiple offenses of conduct unbecoming an officer. They were also aware Appellant had been convicted in 2015 of a misdemeanor offense of stalking another woman, DU. The Defense itself conceded that confinement for 12 months would be an appropriate punishment. We find it entirely unsurprising that the court members would have imposed a dismissal as part of Appellant's punishment.

We do not find trial counsel's equation of the imposition of a "dismissal" with "real justice" in Appellant's case to be obviously or clearly erroneous. It was simply an expression of trial counsel's view of an appropriate sentence. Similarly, trial counsel's references to a "uniform" sentence were evidently an argument that Appellant should not receive a more lenient sentence than another servicemember might by reason of Appellant's rank or length of service. We do not find this argument clearly or obviously deprived Appellant of individualized sentencing consideration.

Although trial counsel did invite the court members to consider "what people will think" if the court-martial did not adjudge a dismissal, the comment was evidently not designed to invoke the specter of future personal ostracism or condemnation of the court members themselves in the manner the CAAF found problematic in *Norwood*, 81 M.J. at 21. Instead, trial counsel was evidently appealing to the court members' sense of justice and fairness in sentencing, regardless of the offender's rank, similar to trial counsel's comments regarding "uniformity." Although referring to opinion outside the courtroom can

be dangerous territory for trial counsel argument, under the circumstances of this case we find no clear or obvious error in this respect.

Accordingly, we find Appellant has failed to demonstrate plain error in trial counsel's argument. Assuming *arguendo* the quoted portion of trial counsel's argument was erroneous, we further find Appellant has failed to demonstrate the comments were so damaging that we cannot be confident Appellant was sentenced on the basis of the evidence alone.

## G. Racial Discrimination

### 1. Law

Generally, defenses or objections based on non-jurisdictional defects in the preferral, forwarding, or referral of charges are waived if not raised before entry of pleas. R.C.M. 905(b)(1), 905(e); *see United States v. Henry*, 42 M.J. 231, 235 (C.A.A.F. 1995).

"The burden of persuasion on a claim of selective prosecution is on the moving party." *United States v. Argo*, 46 M.J. 454, 463 (C.A.A.F. 1997); *see* R.C.M. 905(c)(2)(A).

> To support a claim of selective or vindictive prosecution, an accused has a "heavy burden" of showing that "others similarly situated" have not been charged, that "he has been singled out for prosecution," and that his "selection . . . for prosecution" was "invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

*Argo*, 46 M.J. at 463 (quoting *United States v. Garwood*, 20 M.J. 148, 154 (C.M.A. 1985)). Appellant bears the burden to rebut the presumption that prosecutorial authorities and convening authorities act without improper bias. *Id.*

### 2. Analysis

Appellant, who is African-American, personally asserts the following pursuant to *Grostefon*, 12 M.J. at 436: "The Government manufactured the 'rape' allegation to justify [Appellant's] court-martial for conduct that would otherwise be the subject of adverse administrative action or Article 15, UCMJ, [10 U.S.C. § 815,] punishment simply because Appellant was a young black man who had sex with a white woman[17] who later regretted the encounter." Appellant cites a May 2020 media article describing studies from 2017 and 2019 which found, *inter alia*, substantial disparities in the rates at which black Air-

---

[17] TS is Caucasian.

men and white Airmen were tried by courts-martial. Appellant does not identify any particular individual who he claims acted with an improper race-based motivation; instead, he contends "[w]hether the discrimination against Black [A]irmen is a result of 'conscious' or 'unconscious' bias, these reports make clear that race does in fact play a role in determining whether a servicemember is court-martialed for rape." However, Appellant does not identify any similarly situated individual who was not prosecuted for rape.

As a basis for appellate relief, Appellant's argument fails on multiple grounds. In general, where, as here, allegations of racial discrimination in the preferral and referral of charges are not raised prior to entry of pleas, they are waived. Recognizing our authority under Article 66, UCMJ, to pierce waiver in order to remedy a legal error, we might exercise that authority had Appellant shown that he only became aware of the alleged discrimination after his trial. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (citing *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001)); *see also Henry*, 42 M.J. at 235 (declining to apply waiver where "the full picture" of the alleged selective prosecution "may not yet have emerged" at the time of the appellant's trial). However, Appellant does not claim—much less demonstrate—that he could not have raised a similar objection at trial as he now asserts on appeal. Moreover, the May 2020 article Appellant cites, although published after Appellant's trial, falls far short of demonstrating selective prosecution affected *Appellant's* case in particular.

We might also be inclined to pierce Appellant's waiver if the specific evidence of selective prosecution in his case was convincing; but it is not. Appellant has identified no servicemember similarly situated to himself who was not prosecuted for rape. Appellant's evident theory that TS's rape allegation was used as an excuse to court-martial him for offenses that would otherwise have warranted a lower level of disciplinary action is predicated on his view that TS's allegation was manifestly without merit. However, as discussed above, TS provided convincing testimony that Appellant had, in fact, raped her in July 1998. We do not discount the importance of combatting selective prosecution on the basis of race or other impermissible considerations. However, Appellant has failed to meet his burden to demonstrate his entitlement to relief in this case.

**H. Sentence Reassessment**

As noted above, this court's prior opinion set aside the finding of guilty as to Specification 2 of Charge III[18] and certain excepted language from the Specification of Charge I,[19] and dismissed Specification 2 of Charge III with prejudice. That portion of the opinion has remained undisturbed by the CAAF. Accordingly, we have considered the reassessment of Appellant's sentence in light of these changes to the findings.

Under Article 59(a), UCMJ, 10 U.S.C. § 859(a), a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." If we can conclude that absent any error, an adjudged sentence would have been at least a certain severity, "then a sentence of that severity or less will be free of the prejudicial effects of error; and the demands of Article 59(a)[, UCMJ,] will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the [C]ourts

---

[18] Specification 2 of Charge III alleged Appellant violated Article 133, UCMJ, on or about 16 December 2014, by "wrongfully endeavor[ing] to impede an investigation in the case of himself by misleading [FCPD] Detectives by falsely claiming he could not provide his official email address to the detectives, which conduct, under the circumstances, was unbecoming of an officer and gentleman."

[19] As charged, the Specification of Charge I alleged Appellant violated Article 92, UCMJ, on or about 17 December 2014, by being "derelict in the performance of [his] duties in that he negligently failed to protect classified information . . . by taking classified materials to his residence and leaving said classified materials unattended." As modified by this court's prior opinion, the specification alleged Appellant was "derelict in the performance of [his] duties in that he negligently failed to protect classified information . . . at his residence leaving classified materials unattended." *See Daniels*, unpub. op. at *14–15, *15 n.9.

of [C]riminal [A]ppeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

Based upon the principles set out above, we conclude we can reassess Appellant's sentence in light of this court's modifications to the findings of guilty. This court set aside one specification of conduct unbecoming an officer and a gentleman in violation of Article 133, UCMJ, specifically, that Appellant endeavored to impede the FCPD's investigation by falsely claiming he could not provide the detectives with his official email address. However, Appellant remains convicted of two other specifications of violating Article 133, UCMJ, by making false statements to the FCPD detectives that were more substantively related to the substance of the investigation—Appellant's claim that he did not go into DU's backyard on or about 9 December 2014, and his claim that he was not in DU's neighborhood on the date of her 911 call on 16 December 2014. In addition, Appellant remains convicted of an additional specification of violating Article 133, UCMJ, by misrepresenting (through SM) to Col KB the basis for his leave request on 18 December 2014. We note that, significantly, the military judge consolidated all four of the Article 133, UCMJ, specifications for purposes of sentencing.

In addition, this court modified Appellant's conviction for negligently failing to protect classified information in violation of Article 92, UCMJ. In effect, this court's prior opinion upheld the allegation Appellant left classified material unattended in his residence, but set aside the finding that specifically "on or about 17 December 2014" he took classified materials to his residence. See *Daniels*, unpub. op. at *14–15. This modification to the Specification had little effect on the essential nature of Appellant's misconduct and no effect on the maximum sentence the court members could have lawfully adjudged.

Moreover, the severity of Appellant's Article 92 and Article 133, UCMJ, offenses—which combined would have exposed Appellant to a maximum term of confinement of one year and three months, in addition to a dismissal—pales in comparison to Appellant's conviction for raping TS, which alone exposed Appellant to confinement for life in addition to a dismissal. Furthermore, the modifications to the findings would not have impacted the court members' awareness of Appellant's 2015 civilian conviction for stalking DU, and its implications for Appellant's rehabilitation potential.

Therefore, we reassess Appellant's sentence and, based on the totality of the circumstances, conclude the court members would have imposed the same adjudged sentence of a dismissal, confinement for three years, and a reprimand for the remaining convictions. *See Winckelmann*, 73 M.J. at 15. Accordingly, in our decretal paragraph we affirm the sentence approved by the convening authority.

### III. CONCLUSION

The findings of guilty as to Charge I and its Specification, as modified; Charge II and its Specification; Charge III and Specifications 1, 3, and 5 of Charge III; and the sentence, as reassessed, are **AFFIRMED**. The affirmed findings and the reassessed sentence are correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court